LEPLEY, APPELLANT, v. CITY OF FORT BENTON ET AL., RESPONDENTS.

(No. 3,671.)

(Submitted January 3, 1916. Decided January 15, 1916.)

[154 Pac. 710.]

*Cities and Towns—Constitution—Indebtedness—Extension of Limit—Illegality—Appeal and Error.*

Cities and Towns—Extension of Indebtedness—Illegality.
1.   Where a city had authorized an issue of bonds for sewer purposes which fully exhausted the three per cent constitutional limit, it was without power to subsequently issue further bonds for the construction of a lighting plant by having recourse to the device of classing the first issue within the extended ten per cent limit—which may be resorted to only for the procurement of a sewerage system or a water supply—a large enough margin being thus created within the three per cent limit to accommodate the later issue.

Appeal and Error—Questions reviewable.
2.   Where a question of the nature of the above is presented by the record and its solution is decisive of the case, it will be determined on appeal, even though it is not apparent that the district court considered or determined it.

*Appeal from District Court, Chouteau County; J. W. Tattan, Judge.*

ACTION by Charles Lepley against the City of Ft. Benton and others. From an order vacating a temporary injunction, plaintiff appeals. Reversed.

*Messrs. Stranahan & Stranahan* and *Messrs. Cooper, Stephenson & Hoover,* for Appellant, submitted a brief; *Mr. F. E. Stranahan* argued the cause orally.

*Messrs. Lew L. Callaway* and *Charles N. Pray,* for Respondents, submitted a brief; *Mr. Pray* argued the cause orally.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

This action was brought by plaintiff, a resident of the defendant city and the owner of property therein subject to taxation, to restrain the city authorities from issuing and selling bonds of the city to the amount of $17,000 to procure funds to establish a municipal lighting plant. The proposed bond issue was authorized by a vote of the electors of the city held on July 10, 1914. They were sold on January 6, 1915, but when this action was commenced had not been delivered to the purchaser. It is alleged that the indebtedness incurred by the bonds, together with that already incurred and outstanding, will exceed the three per cent limit prescribed by the Constitution, and therefore that the bonds are void.

The following statement of the financial condition of the city is made the basis for this claim: That the assessed valuation of the property within the city for the year 1913 was $810,000, and for 1914 $950,000; that the city is at present indebted to the amount of $44,500, which is made up of these items: Bonds for water supply, *etc.,* "$4,500 and upward"; floating indebtedness represented by outstanding warrants issued in payment of current expenses of the city government, "$3,000 and upward"; bonds sold for the purpose of establishing a sewer system, including a contract by the city for the construction of the system, $33,000; and the city's proportion of $33,394.09, the cost of grading, paving, lighting, *etc.,* in improvement district No. 1 of the city, the contract for which has already been let, the estimated proportion being "$3,000 and upward." Upon the filing of the complaint on February 27, 1915, the court ordered a temporary injunction to issue. On March 23 the defendants filed their answer, denying the material averments in the complaint, and moved for a dissolution of the order. After a hearing, the court made an order sustaining the motion. The plaintiff appealed.

As we gather them from the record, the events giving rise to the controversy may be stated as follows: On December 9, 1913,

the council of the defendant city passed an ordinance, submitting to the taxpayers the question whether the city should contract an indebtedness to the amount of $33,000 by an issue and sale of its bonds to procure funds for the construction of a sewer system. It was recited in the ordinance that the indebtedness thus to be incurred, including existing indebtedness, would exceed the constitutional limit of three per cent of the assessed valuation of the property in the city. In pursuance of the ordinance the election was held on January 30, 1914, and by a majority vote the issuance of the bonds was authorized. On June 1, 1914, the council passed a second ordinance, submitting to the qualified electors the question whether the city should contract an indebtedness to the amount of $17,000 by an issue and sale of its bonds to procure funds to construct a municipal lighting plant. This ordinance recited that the proposed indebtedness, together with that already outstanding, would not exceed the constitutional limit of three per cent. The election held on July 10, 1914, resulted in a favorable vote. On August 1 a contract was let by the council for the construction of the sewer system. The resolution, letting this contract, recited that it was let upon the condition that a sale of the bonds could be effected. The formal contract was executed on August 8. A sale of the bonds not having been effected, on September 8 the contract was so amended by consent of the contractor as to extend the time within which the work of construction should be completed. On January 6, 1915, the council effected a sale of all the bonds authorized at both elections, the lighting plant bonds first, and the sewer bonds a few minutes later. The course pursued by the council indicates that at the time the first issue of bonds was proposed, it held the view that the power of the city to incur any further indebtedness within the three per cent limit would be fully exhausted by that issue. The proposition to make the second issue was therefore an afterthought, the council having doubtless concluded that it could class the whole of the issue first authorized within the ten per cent limit, and thus leave a margin within the three per cent limit for the issue

of those subsequently authorized. Otherwise the order adopted for the sale of the bonds cannot be explained. Indeed, it is claimed by counsel for defendants that the sale of the issue authorized at the June election, first in order, classed the amount represented by them within the three per cent limit, with the result that the issue authorized by the election in January would automatically fall exclusively under the ten per cent limit. At the hearing of the motion it seems to have been assumed by counsel on both sides that this would ordinarily have been the result in such case. Counsel for the plaintiff insist, however, that such could not have been the result here, because the course pursued by the council in letting the sewer construction contract on August 11, 1914, by which it became bound to the amount of $33,000, fixed the status of the bonds authorized to this amount as within the three per cent limit so far as there was any further margin within that limit, and hence exhausted the power of the city to incur any further indebtedness. This contract was admittedly made contingent upon the sale of the bonds; but it follows that when the sale was effected, the city became indebted to the full amount of the bonds and liable to the contractor for the same amount, contingent only on his performance of the contract. Therefore the status of this indebtedness, as to its classification within one limit or the other, thus became fixed by relation to the date at which the debt was authorized, without regard to what was subsequently done.

The decisive question in the case therefore is: Could the council, under the provisions of the Constitution and statute applicable, arbitrarily class the debt authorized at the election of January 30, 1914, as falling exclusively within the ten per cent limit, leaving an unabsorbed margin within the three per cent limit for other indebtedness? [1]

Section 6, Article XIII, of the Constitution, declares: "No city, town, township or school district shall be allowed to become indebted in any manner or for any purpose to an amount, including existing indebtedness in the aggregate exceeding three per centum of the value of the taxable property therein, to be

ascertained by the last assessment for the state and county taxes previous to the incurring of such indebtedness, and all bonds or obligations in excess of such amount given by or on behalf of, such city, town, township or school district shall be void; provided, however, that the legislative assembly may extend the limit mentioned in this section, by authorizing municipal corporations to submit the question to a vote of the taxpayers affected thereby, when such increase is necessary to construct a sewerage system or to procure a supply of water for such municipality which shall own and control said water supply and devote the revenue derived therefrom to the payment of the debt.''

Subdivision 64 of section 3259 of the Revised Codes was enacted in part to effectuate this provision, and, so far as applicable here, is simply an enactment of the provision of the Constitution in statutory form. The provision was examined and construed in *Butler* v. *Andrus,* 35 Mont. 575, 90 Pac. 785. After stating the purpose of the limitation imposed by the provision, this court said: ''The constitutional limitation in question is clear and unambiguous, and means just what it says, to-wit, that no indebtedness may be contracted in any manner or amount, for any purpose, in excess of the prescribed limit. (*State ex rel. Helena Waterworks Co.* v. *City of Helena,* 24 Mont. 521, 81 Am. St. Rep. 453, 55 L. R. A. 336, 63 Pac. 99.) The proviso under which the legislature may authorize an extension of the limit is also clear in purpose, to-wit, to allow an extension of this limit when such extension (increase) is necessary to construct a sewerage system or procure a water supply. It cannot be granted or be made available for any other purpose nor under any other circumstances than those which create the necessity for it. The legislature, in granting the privilege, used the expression, 'and an *additional* indebtedness shall be incurred when *necessary* to construct,' *etc.* This language seems susceptible of but one construction. There may be no extension, if there is no debt already contracted, for the word 'additional' qualifies the character of the debt to be contracted, and

refers also to a pre-existing amount of indebtedness to which it may be added. The word 'necessary' defines the condition of affairs which requires the additional indebtedness. The condition must be such as to create the necessity. If a municipality is not indebted in any amount at all, or if it has the necessary funds in its treasury, no *additional* indebtedness can be incurred; nor can it be said that any necessity has arisen demanding it. Otherwise, we are compelled to the conclusion that, whenever a city government has determined to construct a sewerage system or procure a water supply, this fact of itself creates the necessity by which the privileged extension is made available, without regard to the city's financial resources and its existing indebtedness, and without regard, also, to the necessities of the people for a sewerage system or a water supply. This is the interpretation of the statute for which defendants contend; but, in view of the purpose of the limitation declared in the Constitution, and the terms employed in the statute, we think the only conclusion permissible is that the privilege of the extension becomes available only when the financial condition of the city requires a resort to it in order to serve the comfort or preserve the health of the people.'' Upon further consideration of its purpose and the terms in which it is couched, we think the construction there given it the only one of which it is reasonably susceptible, and answers the question propounded above in the negative.

The authority sought by the council and granted by the taxpayers at the election held in January, 1914, was to increase the existing indebtedness of the city by an encroachment upon the ten per cent limit so far as was then necessary for the construction of a sewer system. This was granted. There was then a substantial margin within the three per cent limit. It was not necessary to go wholly within the extended limit. Indeed, it was not permissible, under the decision in *Butler* v. *Andrus, supra,* to do this, for the taxpayers could go no further than to authorize an increase of, or addition to, the indebtedness of the city as then existing. The result of the exercise of the

authority conferred was to increase an indebtedness to the full capacity of the city for all purposes, except for an additional water supply, or the extension of its sewer system when it might become necessary. This must be the result; otherwise a city may resort to the extended limit at any time, however ample its financial resources may be within the three per cent limit. To be sure the defendant city cannot now install a lighting plant, even though it might have done so had it undertaken this improvement first and left the sewer system to be provided for later. This may be a hardship, but it is the plain mandate of the Constitution that cities and towns may not go beyond the prescribed limit of indebtedness in any manner or for any purpose, except as therein provided, and that they cannot transcend this limit except when necessary.

Let it be conceded, however, that it is competent for the taxpayers to authorize the council to contract an indebtedness exclusively within the extended limit for either water supply or a sewer system; they did not do so in this case, for the ordinance indicates that the purpose of the council in consulting them was to get their consent to contract an indebtedness which, including all existing indebtedness, would exceed the three per cent limit. The permission asked and given, therefore, was to exceed this limit, not to contract an indebtedness exclusively without it. For the presumption must obtain that the taxpayers assented to the request as made. Under these circumstances the council could not even by a resolution classify the debt, much less could it do so by resorting to the device of selling the light bonds a few minutes in advance of the sale of the others. The result is that the council had no authority to sell the lighting plant bonds at all.

It is true that in the case of *Arnold* v. *Miles City,* 46 Mont. 478, 128 Pac. 915, it was held that, when the indebtedness of a city incurred under the three per cent limit has been reduced by payment until it has fallen below the limit, or because of an increase in the value of the taxable property of its inhabitants, a margin is created within this limit, the city may

contract an indebtedness for general purposes to the extent of the margin, as for the construction of a bridge. But the situation presented in that case was that the indebtedness within the ten per cent limit had been contracted under circumstances which of necessity classed it exclusively within that limit, and hence that a subsequent change in the financial condition of the city did not change its character so as to bring it partly within the three per cent limit. Whether the rule announced in that case is logically correct or not, we do not think it should be extended to cases which do not fall clearly within its purview. In our opinion this case is not such a one.

At the hearing in the trial court the inquiry was directed exclusively to an effort to ascertain whether the existing indebtedness of the city was not already too large to permit the [2] issue and sale of the bonds in question; it being apparently assumed that the amount of the sewer bonds would fall exclusively within the extended limit. It is not clear whether the question determined above was considered or determined by the trial court. Even so, since it arises upon the record and counsel have submitted it, we have deemed it proper to decide it. Our conclusion being decisive of the case, it is not necessary to examine the several assignments based upon the rulings of the court in admitting and excluding evidence, or to determine whether, viewing the evidence as a whole, the court abused its discretion in sustaining defendants' motion.

The order is reversed, at the cost of the defendants.

*Reversed.*

MR. JUSTICE SANNER and MR. JUSTICE HOLLOWAY concur.